**In re Anonymous No. 50 D.B. 85**

Disciplinary Board Docket No. 50 D.B. 85.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

HEH, *member*, February 5, 1987—Pursuant to rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania (the board)

herewith submits its findings and recommendations to your Honorable Court with respect to the above petition for discipline.

## HISTORY OF PROCEEDINGS

Respondent, [    ], was born in 1950, admitted to practice law in Pennsylvania in 1976, and his office is located at [    ].

A petition for discipline identifying three legal matters was filed on June 13, 1985, against Attorney [    ], the within respondent, by the Office of Disciplinary Counsel.

The petition for discipline alleged that respondent had violated the following disciplinary rules of the Code of Professional Responsibility:

A. DR 1-102(A)(4) — A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

B. DR 6-101(A)(3) — A lawyer shall not neglect a legal matter entrusted to him.

C. DR 9-102(A) — A lawyer shall deposit client funds in one or more identifiable bank accounts and maintain and use an escrow account.

D. DR 9-102(B)(3) — A lawyer shall maintain a complete record of all funds of a client coming into the possession of the lawyer and render appropriate accounting to his clients regarding them.

The matter was referred to hearing committee [    ] comprised of [    ]. An evidentiary hearing was conducted on Wednesday, October 16, 1985, in the Office of Disciplinary Counsel, [    ]. The hearing committee filed its report on March 5, 1986, at which time the hearing committee recommended respondent's suspension from the practice of law for a period of one year.

Counsel for respondent filed a brief on exceptions on March 27, 1986, and requested oral argument.

On April 15, 1986, petitioner's brief opposing respondent's exceptions was filed.

Thereafter, the matter was assigned to a three-member panel of the disciplinary board for oral argument. Oral argument was heard on Wednesday, May 21, 1986, before board members John A. Tumolo, Esq., Gilbert J. Helwig, Esq. and the undersigned. The matter was adjudicated by the full board at its regularly scheduled meeting on May 22, 1986.

## SUMMARY OF EVIDENCE

Virtually the entire factual context of the matters at issue were stipulated to prior to the evidentiary hearing. As a result of these stipulations, the evidentiary hearing consisted of petitioner's presentation of the testimony of [A's] comptroller, [B], three members of the [C] family and [D]. Respondent's defense consisted of his own testimony in addition to two character witnesses, one of whom was his wife. It is important to note that [B] and the [C] family members bore no grudge against respondent.

Respondent is a sole practitioner with offices in [    ] County. With respect to his law practice, respondent was entrusted with three legal matters of [A] Inc. during a period from mid-August 1983 through April 21, 1984. [A] was a business enterprise of the [C] family and included other affiliated family businesses such as [E] and [F] Products. The three legal issues are as follows:

A. Fictitious Name Matter:

Respondent admits having accepted a $750 fee payment from [A] Inc. on August 18, 1983, to file fictitious applications for various [C] family entities. This $750 fee payment was deposited in respondent's attorney-at-law account. The check's actual amount was $850 which included a $100 fee for a

will respondent had prepared for Frank [C]. According to respondent, the necessary applications and notices were prepared but never filed because the corporate officers ignored his requests to come to his office and sign them. At the meeting of April 21, 1984, there was no evidence the documents had been prepared for the fictitious name applications and notices.

B. [G] Litigation:

On August 16, 1983, [D] of the [   ] County Bar filed a complaint in assumpsit at No. [   ] of 1983 ([   ] County) on behalf of [G] Trading Company Inc. against [F], a division of [A] Industries and among the [C] Enterprises. The complaint alleged an unpaid balance due in the amount of $18,904.41, together with interest and costs incurred by sales of methanol from plaintiff to defendant in October and November 1982. On an uncertain date in August, respondent agreed to defend [A] with regard to the [G] matter. On September 9, 1983, respondent entered his appearance on behalf of [A] and filed preliminary objections. On September 24, 1983, [A] gave respondent a check in the amount of $6,000 and annotated "Down Payment [G] Company" to assist respondent with negotiations with Attorney [D]. This $6,000 check was deposited in the attorney-at-law account rather than his trust account. Respondent negotiated an agreement of $12,500 to be paid $500 at the execution of the settlement and $500 on the first day of each month thereafter until March 1 when $5,000 was due. These payments did not include any interest. On November 25, 1983, Attorney [D] transmitted the settlement documents to respondent calling for payment as agreed but containing a confession of judgment clause in the amount of $18,904.41 plus costs and fees should [A] default. Respondent misrepresented to his client

that the [G] had been settled for $18,900. Respondent delivered only portions of the note for signatures which were signed by Gertrude [C] and Steven [C], as secretary and vice-president of [A]. Respondent delivered a bill for services on December 21, 1983, for $450 and discounted to $420 with no reference to the $6,000 payment. Respondent led client to believe a $6,000 payment had been forwarded to plaintiff as a partial payment. At a meeting on April 21, 1984, Frank [C] indicated to the hearing committee, he was shown a photostatic copy of the front of a check for $6,000 which respondent alleged he had given Attorney [D] in November.

C. Bankruptcy Matters:

Respondent had advised [A] Inc. at various times to consider bankruptcy proceedings in response to their continuing financial problems. On April 2, 1984, respondent accepted a $3,000 fee payment to initiate bankruptcy proceedings. This check was deposited to respondent's attorney-at-law account. [A's] comptroller gave respondent a list of the company's creditors which respondent said was necessary to initiate the bankruptcy petition. [A's] comptroller testified respondent has assured him the "preliminary" bankruptcy papers had been filed. As of April 21, 1984, respondent had not initiated any proceedings.

## FINDINGS OF FACT

The stipulation of the parties received as petitioner's exhibit 1 is adopted by the board as it was by the hearing committee. In addition, the board concurs with the findings of fact listed by the hearing committee as follows:

(1) That petitioner, whose principal office is located at 300 N. Second St., Harrisburg, Pa., is in-

vested, pursuant to rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) That respondent [ ] was born in 1950, admitted to practice law in Pennsylvania in 1976, and his office is located at [ ].

(3) That at all times relevant to the alleged violations here at issue, [A]. Inc. ("[A]") was a Pennsylvania corporation owned and operated by the Frank [C] family along with at least two other affiliated family businesses known as [E] and [F] Products.

A. Fictitious Name Matter:

(4) That shortly after August 16, 1983, and in the course of an on-going business relationship, respondent suggested to [A] that fictitious name applications be filed for not only [A] but also for the other affiliated businesses of the [C] family.

(5) That respondent then requested $750 as an advance fee for filing appropriate fictitious name applications for [A] and its affiliated businesses.

(6) That in regard to this request, respondent received $850 from [A] by its check no. 430 dated August 18, 1983, and annotated "fictitious name filing (legal fees)" ($100 of the $850 represented payment to respondent for a will he had prepared for Frank [C]).

(7) That [A's] check no. 430 was deposited into respondent's attorney-at-law general account maintained at [H] Bank in [ ], Pa., instead of his office escrow account.

(8) That according to respondent, he promptly prepared the necessary applications and notices but they were never filed because the necessary corpo-

rate officers ignored his requests to come to his office and sign them.

(9) That respondent thereafter failed to file any fictitious name applications or notices as of April 21, 1984.

(10) That upon examining repondent's files following the meeting of April 21, 1984, the [C's] found no evidence that any work had been done by respondent to prepare the necessary fictitious name applications and notices.

B. "[G]" Litigation:

(11) That on August 6, 1983, Attorney [D] of the [ ] County Bar filed a complaint in assumpsit at No. [ ] of 1983 ([ ] County on behalf of [G] Trading Company Inc. (hereinafter "[G]") against [F] Products, a division of [A] *Industries* Inc. (emphasis supplied), claiming an unpaid balance due in the amount of $18,904.41 together with interest and costs of suit, in regard to a debt incurred by sales of methanol from plaintiff to defendant in October and November 1982.

(12) That on an uncertain date in August 1983, respondent agreed to defend [A] in regard to the [G] suit on an unspecified fee basis.

(13) That on September 9, 1983, respondent entered his appearance on behalf of [A] and filed preliminary objections.

(14) That [A] gave respondent its check no. 587 dated September 14, 1983, payable to him in the amount of $6,000 and annotated "Down Payment — [G] Trading Co.," to assist him in his settlement negotiations with Attorney [D].

(15) That the $6,000 check was promptly deposited by respondent on or about September 19, 1983, in his [H] Bank attorney-at-law general account, rather than his office escrow account.

(16) That respondent and Attorney [D] reached a tentative settlement agreement in the latter part of November, and on November 30, 1983, both parties consented to entry of an order of court continuing the matter generally.

(17) That as tentatively agreed to by respective counsel, the [G] litigation was to be settled upon payment by [A] to plaintiff of the total sum of $12,500 over a period of time with $500 to be paid upon execution of the settlement documents and $500 on the first day of each month thereafter (with the exception of March 1, 1984, when $5,000 was due) until the full $12,500 was entirely paid (but without interest).

(18) That on November 25, 1983, Attorney [D] transmitted the settlement documents to respondent as follows:

a. A promissory judgment note (note) typed on four pages and calling for a payment of $12,500 in installments over a period of time (see above) but containing a confession of judgment clause in the amount of $18,904.41 (plus costs and fees) should [A] default; and,

b. The settlement agreement (the agreement) typed on three pages and essentially reciting in summary form the repayment provisions outlined above.

(19) That prior to December 30, 1983, respondent had fraudulently misrepresented to his client that he had settled the [G] case of *$18,900* (emphasis added), the full amount claimed, but he explained that this was actually to [A's] benefit because it would ultimately save it $2,000 to $3,000 in attorney's fees.

(20) That respondent delivered only portions of the note and the agreement to the offices of [A] on an uncertain date in late December 1983, and those

portions consisted of the last two pages of the note and only the last page of the agreement (i.e. the signature pages).

(21) That by sending his client only portions of the two settlement documents, respondent concealed the fact that the actual settlement with [G] was $6,400 less than he had led his client to believe, and it further obviated any need to account to his client for the $6,000 he continued to hold despite having told his client that it had been given to Attorney [D] earlier as a part of the settlement.

(22) That because they trusted respondent, Gertrude [C] and Steven [C], as secretary and vice president respectively of [A], signed the proffered portions of the settlement documents without any questions regarding the missing pages or other aspects of the settlement including repondent's claim that the $6,000 advance of September 19, 1983, had been given to [G's] attorney earlier in partial fulfillment of the settlement.

(23) That respondent had made an earlier visit to the offices of [A] on December 21, 1983, and respondent used that opportunity to present his client with a bill for services in the amount of $450 which he gratuitously discounted to $420 and which was promptly paid by [A] check no. 963 on December 21, 1983.

(24) That respondent's billing to his client of December 21, 1983, purposely omitted any mention of the $6,000 belonging to his client which respondent had possessed since September 19, 1983, and that this omission lends further credence to petitioner's theory that respondent intentionally misstated the terms of settlement of the [G] litigation to his client.

(25) That on an uncertain date in early January 1984, respondent sent the properly executed note and agreement (on which respondent had inserted

the date December 30, 1984, [sic] and December 30, 1983, respectively) to attorney [D].

(26) That on January 24, 1984, Attorney [D] sent copies of the settlement documents which by then had been executed by his client to respondent and demanded the initial installment of $500 which was then past due.

(27) That on an uncertain date, but one thought to be in late January 1984, respondent became aware that his client was having extreme problems with its cash flow.

(28) That despite the fact that settlement had been reached on terms essentially favorable to his client and despite the fact that he continued to hold the $6,000 given to him on September 19, 1983, to help settle the case, respondent neither revealed this latter fact to his client nor made the excess funds available to his client for its use.

29. That when more than two months elapsed without any of the payments required by the note and agreement having been made, Attorney [D] filed a complaint for confession of judgment on April 10, 1984, in the total sum of $18,404.41 plus costs, and had a writ of execution served upon a bank where he believed [A] maintained an account, and gave notice of the judgment and execution proceedings to [A].

30. That upon being served with a copy of the writ, [A's] comptroller became suspicious because the amount confessed was $6,000 more than the settlement amount as told to him by respondent.

31. That when [A's] comptroller confronted respondent with the apparent discrepancy, he was once again assured by respondent that the $6,000 had been paid to [G] during the late fall of 1983.

32. That shortly after April 10, 1984, [A's] comptroller telephoned Attorney [D] directly and only

then learned not only that respondent had never paid the $6,000 in question, but also that the true amount of the settlement was $12,500 rather than the $18,900 figure quoted by respondent.

33. That at a carefully orchestrated meeting held at company headquarters on April 21, 1984, [A's] angry owners confronted respondent with his alleged duplicity in the settlement of the [G] litigation.

34. That in what was apparently a last desperate effort to shift blame away from himself, respondent showed his accusers a photostatic copy of the front of a check for $6,000 which he alleged he had given to Attorney [D] in November 1983, but he refused to show them a copy of the reverse side.

35. That neither party produced this alleged "check" at the hearing of October 16, 1985, or tried to admit it into evidence, and the hearing committee therefore finds that it was a fake and part of the ongoing pattern of deceit.

36. That at the conclusion of the meeting, respondent repaid [A] the $6,000 given to him on September 19, 1983, and was discharged as their counsel.

C. The Bankruptcy Matter:

37. That in early 1984, [A's] financial condition was becoming precarious, and it continued to grow worse in February and March of that year.

38. That when he was advised of this stipulation, respondent recommended to his client that it should consider filing for bankruptcy but said that he would need $3,000 in advance to pay the necessary fees and costs associated with filing "preliminary papers."

39. That on or about April 2, 1984, [A] gave respondent its check no. 1242 made payable to him in the amount of $3,000 which he promptly deposited in his attorney-at-law general account rather than

his office escrow account.

40. That along with the check for $3,000, [A's] comptroller gave respondent a list of the company's creditors which respondent said he needed to initiate the bankruptcy petition.

41. That on an uncertain date, but one reasonably thought to be shortly after April 10, 1984, (the date [A] was served with the writ of execution in the [G] case), [A's] comptroller called respondent and was assured by him that the "preliminary" bankruptcy papers had been filed.

42. That as of April 21, 1984, respondent had not filed anything with the bankruptcy court in [     ] on behalf of his client.

43. That on April 21, 1984, respondent returned to [A] the $3,000 given to him on April 2, 1984.

D. Miscellaneous:

44. That throughout the period in question, respondent maintained at least two bank accounts for his legal practice:

a. A trust account (No. [     ]) for client's funds at [I] Bank of [     ] Pennsylvania; and

b. An office account (No. [     ]) for personal funds at the [H] Bank.

45. That between August 18, 1983, and April 2, 1984, respondent placed three checks from [A] totaling $9,750 into his office account when in fact they should have been placed in his trust account.

46. That at no time during the period in question did respondent's office account hold less than $60,000.

47. That at no time did respondent convert his client's funds to his own use and benefit.

48. That when on April 21, 1984, [A's] owners demanded the return of their unearned advances totaling $9,750, respondent promptly complied with their request.

49. That [A] retained other counsel after April 21, 1984, and apparently went through a Chapter 11 bankruptcy proceeding, but otherwise suffered no long-term or irreparable harm as a result of respondent's acts or omissions.

50. That respondent's acts and omissions were brought to the attention of the Office of Disciplinary Counsel by someone other than members of the [C] family or any of their employees.

## CONCLUSIONS OF LAW

The respondent has violated the following disciplinary rules:

A. DR 1-102(A)(4) — A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

B. DR 6-101(A)(3) — A lawyer shall not neglect a legal matter entrusted to him.

C. DR 9-102(A) — A lawyer shall deposit client funds in one or more identifiable bank accounts and maintain and use an escrow account.

D. DR 9-102(B)(3) — A lawyer shall maintain a complete record of all funds of a client coming into the possession of the lawyer and render appropriate accounting to his clients regarding them.

## DISCUSSION

Petitioner's case consisted of the testimony of [A's] comptroller and three [C] family members in addition to [D], for [G]. Respondent's defense consisted of his own testimony and two character witnesses, one of whom was his wife. [J], represented respondent at the hearing while [K] Esq. and [L] Esq. filed respondent's brief on exceptions and represented respondent at the board's oral argument.

The petition contained various allegations of professional misconduct involving respondent's handling of three legal matters for Frank [C] and/or his family enterprises for the period of August 1983 until April 1984.

The evidence as a whole indicates that respondent, through neglect, failed to carry out his responsibilities in the matters entrusted to him by Frank [C], his family and their business entities. The board agrees with the evidence and finds that respondent did neglect the legal matters with an exception. The board has determined that two of the three payments to respondent from [A] Inc. were actually for fees and services and thus not obligated to be included in respondent's trust account.

The [A] comptroller's and [C] family members' testimony for the hearing committee is often inconsistent and lacks pertinent details to substantiate all allegations as outlined in petition for discipline.

With respect to the fictitious name petition, the board concluded payment of the check for $850 from [A] Inc. which included a $750 fee for fictitious name registration and $100 for the will which had been completed by respondent for Frank [C] along with payment fees intended for services rendered and could justifiably be placed in the attorney-at-law account instead of the escrow account.

The evidence clearly indicates the payment of $6,000 to respondent was to serve as a down payment for the debt incurred to [G] by [F] a division of the [A] Inc. and should have been placed in respondent's escrow or trust account.

The board concluded the records of two of the three payments in the instant case were for fees and costs for the fictitious name registrations and bankruptcy proceedings, so respectively, no records were required.

Respondent respectfully submitted that the hearing committee's findings as to the purported violations of applicable disciplinary rules were not supported by the evidence of record and therefore, the recommended disciplinary sanction was not warranted.

Respondent noted the cases cited by the hearing committee (*Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982); and *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983)), are inapposite. All of the attorneys involved in those disciplinary matters (a) were charged with and were shown to have violated disciplinary rules with respect to a number of clients; and/or (b) had converted client's funds to their own use. In addition, at least in *Lewis* the respondent had a prior history of disciplinary sanctions prior to the formal charges which were heard by the Pennsylvania Supreme Court.

In his brief on exceptions, respondent submitted that more instructive cases exist in the rapidly growing body of disciplinary case law. In *In Re: Anonymous, No. 39 DB 79,* 19 D. & C. 3d 786 (1980), the attorney engaged in deceitful misconduct involving one client, and was publicly censured by the Supreme Court. In *In Re: Anonymous, No. 19 DB 76,* 8 D. & C. 3d 400 (1976), respondent-attorney was adjudged to be in violation of various disciplinary rules in four separate charges, including neglect, commingling, charging excessive fees and failing to pay over to clients funds when required. Respondent in that case also received a public censure by the Supreme Court of Pennsylvania. In *In Re: Anonymous, No. 26 DB 83,* 31 D. & C. 3d 276 (1984), this honorable board recommended

that respondent be suspended for a period of two years, but the Supreme Court instead ordered only a one-year suspension for professional misconduct which, it is submitted, was far more egregious than that in which the hearing committee found that respondent in this case engaged. That case involved an attorney who both commingled and converted a client's funds. Interestingly, in that case, the hearing committee took note of the fact that respondent had performed services for clients without charging them legal fees, as the record indicates respondent did in the instant matter. Also, in that case, the hearing committee found that respondent totally neglected to have an escrow account, which is not the situation in the case at bar.

It appears the hearing committee's recommended disciplinary action exceeds that which should be imposed under the circumstances. Respondent has no record of prior discipline. There is no evidence of record to even suggest that respondent constitutes a threat to the public. Respondent returned all monies when requested by clients on April 21, 1984, and the hearing committee concluded that respondent had not converted any funds.

It should also be noted that respondent was placed in jeopardy by his own willingness to turn over to his then-former clients, all of his files on this matter. These materials were never returned to respondent, or photocopied as promised.

## RECOMMENDED DISCIPLINE

The board unanimously recommends respondent receive a public censure.

The board agreed with the hearing committee's report which stated: "The committee concluded that the violation in the instant case while multiple

in number concerned only one client and occurred over a relatively short period of time. . . ."

It is important to note that all funds have been returned to respondent's former client including fees for services when he gave the client a check from his attorney-at-law account in the amount of $9,750 as requested. Also at all times the escrow or trust account had in excess of $60,000 and was never out of trust.

The disciplinary board does not accept the recommendation of a one-year suspension as requested by hearing committee [   ].

The Disciplinary Board of the Supreme Court of Pennsylvania recommends respondent receive a public censure by the Supreme Court of Pennsylvania and hereby recommends such a disposition in this matter to the Supreme Court of Pennsylvania and that the costs are to be paid by respondent.

Messrs. McDonald and Padova did not participate in the adjudication.

### ORDER

And now, this March 30, 1987, upon consideration of the report and recommendation of the disciplinary board dated February 5, 1987, and the petition for review filed by the Office of Disciplinary Counsel, the petition for review is denied, and it is ordered that [respondent] be subjected to public censure by the Supreme Court at the session of court commencing September 21, 1987, in Pittsburgh. It is further ordered that respondent shall pay costs, if any, to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.

Mr. Justice Larsen did not participate in the consideration or decision of this matter.